UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

**ELECTRONICALLY FILED**

UNITED STATES OF AMERICA                                    PLAINTIFF

v.                             CRIMINAL ACTION NO. 3:16-CR-00082-7-DJH

JOLIE JOHNSON et al.                                        DEFENDANTS

## DEFENDANT JOLIE JOHNSON'S MOTION TO SUPPRESS WIRETAP EVIDENCE

Federal investigators knew next to nothing about Jolie Johnson until they listened to her talking on the phone to Ismael Gonzalez on May 6, 2016.  (Records for WT 16-12 (first extension of wiretap on "Target Telephone 5"); *see* Attach. 6 at pg. 27, Sanders Affidavit VI at pg. 16 ¶ 19.)  The authorities monitored this call because, three days earlier, this Court had approved a wiretap on Mr. Gonzalez's phone.  (Records for WT 16-12 (Sanders "Affidavit IV," wiretap on "Target Telephone 5"), Order of May 3, 2016; *see* Attach. 4 at pp. 49-54.)  (*See* Table 1, "Wiretap Cross-Reference," below.)

The government sought permission to eavesdrop on Mr. Gonzalez because, in the words of DEA Special Agent Brian Sanders, "the interception of wire communications over [Mr. Gonzalez's phone] … is the only available technique that has a

**Wiretap Cross-Reference Table**

| Attach. # | Sanders Affid. # | U.S. Dist. Ct. Misc. File No. | Application Date | Telephone Owner | | Target Telephone # |
|---|---|---|---|---|---|---|
| 1 | I | WT 16-4 | 03/02/16 | ESTRADA, Yamil | 1 | (502) 544-5296 |
| 2 | II | WT 16-6 | 03/08/16 | ESTRADA, Yamil | 2 | (502) 415-9663 |
| 3 | III | WT 16-9 | 04/08/16 | ESTRADA, Yamil | 2 | (502) 415-9663 |
| | | | | RUIZ, Ricardo | 3 | (502) 418-1627 |
| | | | | RUIZ, Ricardo | 4 | (305) 803-6618 |
| 4 | IV | WT 16-12 | 05/03/16 | GONZALEZ, Ismael | 5 | (502) 708-6953 |
| 5 | V | WT 16-14 | 05/20/16 | RUIZ, Ricardo | 3 | (502) 418-1627 |
| | | | | RUIZ, Ricardo | 4 | (305) 803-6618 |
| 6 | VI | WT 16-12 (1st ext) | 06/01/16 | GONZALEZ, Ismael | 5 | (502) 708-6953 |
| 7 | VII | WT 16-12 (2nd ext.) | 06/13/16 | GONZALEZ, Ismael | 5 | (502) 708-6953 |
| | | | | GONZALEZ, Ismael | 6 | (502) 708-6785 |
| 8 | VIII | 16-17 | 06/29/16 | GONZALEZ, Ismael | 7 | (502) 408-2786 |
| | | | | WATTS, Dante | 8 | (502) 408-7590 |

reasonable likelihood of securing the evidence necessary to prove beyond a reasonable doubt" that Mr. Gonzalez was collaborating with Ricardo Ruiz to sell drugs in the Louisville area.   (Attach. 4 at pp. 14, 30, Sanders Affid. IV at pg. 4 ¶ 5(i) and pg. 20 ¶ 38.)  Agent Sanders contended that "normal investigative procedures" could not meet this objective, either because they "have been tried and

have failed," or "reasonably appear unlikely to succeed if tried," or "are too dangerous to employ." (*Id.* at pg. 50, Order at pg. 2 ¶ (c).)

This claim of necessity was not borne out by Agent Sanders's affidavit, however.  As explained below, law enforcement officers actually made almost no effort at all to investigate Mr. Gonzalez by ordinary measures before applying for a tap on his phone; rather, they rushed to obtain the wiretap just two weeks after first learning that he was doing business with Ruiz.  Because the government had not exhausted normal investigative methods against Mr. Gonzalez, the wiretap was illegal, and this in turn requires the suppression of all recordings of Ms. Johnson on this wiretap, as well as all evidence (including subsequent wiretaps) derived from this unlawful surveillance.

**Background: The Estrada investigation (October 21, 2015 - March 2, 2016)**

The government sought permission for wiretaps eight times in a four-month period between early March and late June 2016.  Some of these applications sought brand new wiretaps; others asked to extend wiretaps already in place.

The wiretaps all trace their origin to the DEA's investigation of Yamil Estrada, which began in earnest in late 2015.  Agents began digging into Estrada's activities following an October 2015 seizure of drugs and cash from a Louisville house. (Attach. 1, records for WT 16-4 (Sanders "Affidavit I," wiretap on "Target

Telephone 1") at pg. 19, affid. at pg. 8 ¶ 16.)  The suspect in that case told investigators that he had been purchasing two kilograms of heroin from Estrada every week since March 2015.  (*Id.* at pg. 20, Sanders Affid. I at pg. 9 ¶ 21.)  In January 2016, the source notified DEA agents that Estrada had called him with instructions to meet to discuss a drug deal.  (*Id.* at pp. 20-21, Sanders Affid. I at pp. 9-10 ¶ 24.)  The source, equipped with a digital recorder, went to Estrada's house on the appointed day; Estrada told him that he could supply "kilogram quantities of heroin, cocaine, and methamphetamine," and gave the source a sample of methamphetamine to take away with him.  (*Id.* at pg. 21, Sanders Affid. I at pg. 10 ¶ 27.)  The methamphetamine and the recording of the meeting were duly delivered to the DEA agents. Coincidentally, federal investigators in New York City called Louisville DEA agents that same day with news that Estrada had made plans to deliver a large amount of cash to a courier in the next few days.  (*Id.* at pp. 21-22, Sanders Affid. I at pp. 10-11 ¶ 29.)   An undercover DEA agent posed as the courier and met with Estrada, who handed the agent a bag with $60,000.00 in cash.  (*Id.* at pg. 23, Sanders Affid. I at pg. 12 ¶ 37.)   The confidential source completed two drug deals at Estrada's house in the next few weeks, purchasing 6.5 ounces of heroin on February 9, 2016, and 7.0 ounces on February 18.  (*Id.* at pp. 24-29, Sanders Affid. I at pp. 13-18 ¶¶ 42-61.)

Thus, by early March 2016, DEA agents had built a compelling case against Estrada.  They had found a confidential source and had successfully organized two significant heroin transactions.  They had executed an undercover operation and intercepted $60,000.00 in drug money from Estrada's own hands. They had audio recordings of the drug deals; they knew the identities of two of Estrada's closest lieutenants, both of whom had taken part in monitored drug deals (*id.* at pp. 25-29, Sanders Affid. I at pp. 14-18 ¶¶ 49-52, ¶¶ 56-60); they knew the telephone number of Estrada's probable supplier in Mexico, and knew the dates and times of their phone conversations (*id.* at pp. 24, 30, Sanders Affid. I at pp. 13, 19 ¶¶ 41, 62); they knew the residence where Estrada conducted drug deals and occasionally stored narcotics, and were making plans to position a pole camera outside the location (*id.* at pp. 20, 21, 25, 43, Sanders Affid. I at pp. 9, 10, 14, 32 ¶¶ 21, 27, 49, 96).  To be sure, agents had tried a few investigative methods without immediate success: trash searches had been unavailing thus far (*id.* at pg. 41, Sanders Affid. I at pg. 30 ¶ 91); agents had not yet planted a tracking device on Estrada's car because they were unsure which automobile he was driving (*id.* at pg. 34-36, 40, Sanders Affid. I at pg. 23-25, 29 ¶¶ 73-81, 88); and spot-check surveillance of Estrada's residence had not yielded much.  (*Id.* at pp. 35-36, Sanders Affid. I at pp. 24-25 ¶¶ 74-82.)

**(1)    The first wiretap application (Estrada, March 2, 2016)**

On March 2, 2016, the government applied for a wiretap on Estrada's phone.  (*See* Attach. 1.)  After detailing the months of work already spent on the investigation, Agent Sanders's affidavit addressed the foremost requirement for a wiretap request: proof that ordinary methods of scrutiny could not suffice by themselves to make the government's case.  *See* 18 U.S.C. § 2518(1)(c) ("necessity" requirement).  Agent Sanders described an expansive law enforcement objective: not simply to bring Estrada down, but "to conclusively identify all of the co-conspirators, including alternate sources of supply, other couriers, distributors, or customers, or to define the full nature and scope of the DTO [drug trafficking organization]."  (Attach. 1 at pg. 31, Sanders Affid. I at pg. 20 ¶ 64.)  The government argued that no investigative technique other than eavesdropping could meet this objective.  The confidential source, for instance, had secured much evidence against Estrada, but was "in no position to provide information regarding Estrada's methods of purchasing and transporting large shipments of heroin, cocaine, and methamphetamine," and had "no direct knowledge as to Estrada's methods of laundering the proceeds derived" from drug sales.  (*Id.* at pg. 32, Sanders Affid. I at pg. 21 ¶ 67.)  Similarly, although an  undercover DEA agent had penetrated Estrada's organization, such operatives "would not likely be in a position to obtain a complete view of the members and operation of the DTO."  (*Id.* at pp. 34, 44, Sanders Affid. I at

pp. 23, 33 ¶¶ 71, 97.)  Physical surveillance "would not achieve the government's objectives," Agent Sanders contended: detectives can watch (or a pole camera might record) conspirators gathering for meetings, "but the surveillance observations by themselves are generally insufficient to prove the purpose of the meetings and other activities." (*Id.* at pg. 36, Sanders Affid. I at pg. 25 ¶ 83.) Although toll records for Estrada's phone had already confirmed calls with the confidential source and a suspected drug supplier in Mexico, they "do[] not provide information as to the substance of the conversations, or any certainty as to the exact identities of the actual conversants of the captured telephone calls." (*Id.* at pg. 38, Sanders Affid. I at pg. 27 ¶ 86.)  In like fashion, Agent Sanders slighted such techniques as search warrants, tracking devices, trash searches, and administrative and grand jury subpoenas.  (*Id.* at pg. 39-42, Sanders Affid. I at pp. 28-31 ¶¶ 87, 89-90, 93-94.)

The Court granted the wiretap application.  (*See* Order, Attach. 1 at pp. 56-62.)  In retrospect, the process culminating in this first wiretap is notable for several reasons.  One is the total lack of information in the first affidavit about Jolie Johnson or Ismael Gonzalez, or indeed about any defendant named in the Indictment.  Even more significant, perhaps, is Agent Sanders's strategy of defining an investigative goal of almost unlimited size – not just proof, but "conclusive" proof, against not only Estrada, but everybody connected to Estrada, and not just in Louisville, but

around the world; this convention reappears in all his later wiretap affidavits, even as the focus quickly and decidedly shifts away from Estrada's operation.  The habit of faulting ordinary investigative techniques for their natural limitations – toll records are wanting because they don't reveal the substance of phone calls, for example – also recurs regularly in later affidavits.  Indeed, many of the paragraphs in the first affidavit become boilerplate seen again and again in subsequent offerings.  As discussed later in this memorandum, the tactic of juxtaposing cramped descriptions of investigative methods against a breathtakingly expansive law enforcement goal wrongly distorts the perspective on whether ordinary investigative techniques "reasonably appear to be unlikely to succeed if tried" – especially when detectives have made almost no actual effort to apply such techniques.

**(2)(A) The second wiretap application (Estrada, March 8, 2016)**

The first wiretap quickly came to nothing: Estrada had begun using a new phone.  (Attach. 2, records for WT 16-6 (Sanders "Affidavit II," wiretap on "Target Telephone 2"), at pg. 13, affid. at pg. 3 ¶ 5(c).)  (Law enforcement officers learned Estrada's new phone number after the confidential source posted a note on Estrada's door saying "call me," which Estrada did a short time later.  (*Id.* at pg. 30, Sanders Affid. II at pg. 20 ¶¶ 62-63.))

Agent Sanders quickly returned with a new wiretap request. His affidavit repeated much of his first one, with the significant

addition of details regarding a drug transaction involving Estrada and a new suspect, Elio Lopez-Sarduy. (Attach. 2 at pg. 16, Sanders Affid. II at pg. 6 ¶ 12(b).) The new information was a tribute to traditional investigative methods. First, the confidential source arranged a meeting with Estrada to deliver payment for a prior drug deal. (*Id.* at pp. 30-31, Sanders Affid. II at pp. 20-21 ¶¶ 64-69.) Shortly after the transaction, while the agents were keeping watch on Estrada's home, an automobile arrived. (*Id.* at pg. 38, Sanders Affid. II at pg. 28 ¶ 91.) Agents traced the license number to Lopez-Sarduy's daughter, and they immediately recognized Lopez-Sarduy's name from a drug trafficking investigation the agents had pursued years earlier. (*Id.* at pg. 16, Sanders Affid. II at pg. 6 ¶ 12(b).) The next day, agents learned that city detectives suspected Lopez-Sarduy was storing methamphetamine at his house (*ibid.*), and Estrada's toll records also listed at least four calls involving Lopez-Sarduy's phone in recent weeks. (*Id.* at pg. 32, Sanders Affid. II at pg. 22 ¶ 71(B).)

Agent Sanders's second affidavit said nothing, though, about Jolie Johnson or any of the other named defendants. The Court granted the application on March 8. (Attach. 2 at pp. 50-55.)

**(2)(B) Estrada buys heroin from Ricardo Ruiz (March 30, 2016)**

In late March, agents listening in on Estrada's phone heard several calls indicating that Estrada's source in Mexico had suspended deliveries to Louisville. (Attach. 3 at pp. 23, 27,

Sanders Affid. III at pp. 11, 15 ¶¶ 16, 20.)  Estrada had struck a deal to sell a kilogram of heroin to a local distributor for $68,000.00, and was pressed to find a new supplier who could quickly fill that order.  (*Id.* at pp. 27-28, Sanders Affid. III at pp. 15-16 ¶¶ 22, 24.)  On March 30, Estrada called Ricardo Ruiz.  (*Id.* at pg. 28, Sanders Affid. III at pg. 16 ¶ 24.)

The drug deal that followed this phone call would mark Ruiz's first active involvement with Estrada in the period since the agents began their investigation.  Agent Sanders's earlier affidavits made only scant mention of Ruiz, describing him as one of the confidential source's former suppliers.  (*See* Attach. 2 at pg. 20, Sanders Affid. II at pg. 10 ¶¶ 19-20.)  This was not, however, the first time that law enforcement officers had come across Ruiz.  He had been a peripheral subject in several other drug trafficking investigations in recent years.  In early 2014, for instance, a confidential source told FBI agents that Ruiz was working with Jesus Artiaga, someone the Bureau suspected was selling large amounts of methamphetamine in Louisville.  (Attach. 3 at pg. 26, Sanders Affid. III at pg. 24 ¶ 46.)  As part of that investigation, officers installed a pole camera outside Ruiz's home.  (*Id.* at pg. 36, Sanders Affid. III at pg. 24 ¶ 47.)  Later in 2014, DEA agents arrested another drug seller with Mexican connections, Pablo Vega-Morata, and learned that Ruiz had been one of Vega-Morata's local buyers.  (*Id.* at pp. 24, 34, Sanders Affid. III at pp. 12, 22

¶¶ 16, 37.)  In early 2015, prompted by Vega-Morata's arrest, a Louisville dealer (later the confidential source in the Estrada case) made two drug purchases from Ruiz.  (Attach. 2 at pp. 19-20, Sanders Affid. II at pp. 9-10 ¶¶ 18-21.)  In early 2016, FBI agents tapped the phone of yet another major drug dealer, Rolando Matos, and heard him talk with Ruiz about a possible heroin purchase. (Attach. 3 at pg. 35, Sanders Affid. III at pg. 23 ¶ 45.)  In February 2016, FBI agents installed a location-tracker on Ruiz's car, but had not yet gleaned much useful information from the device.  (*Id.* at pp. 43, 47, Sanders Affid. III at pp. 31, 36 ¶¶ 71, 78.)

Estrada and Ruiz arranged and consummated their deal within the space of a few hours on March 30.  After receiving Estrada's call, Ruiz contacted "Tony" (probably Antonio Ledesma, a source in Mexico for both men) and called Estrada back to confirm he could handle the deal.  (Attach. 3 at pg. 30, Sanders Affid. III at pg. 18 ¶ 25.)  Within a few hours, officers watching Estrada's house saw Ruiz arrive; when Estrada left, other officers followed him on a round trip to the buyer's house and back home; Ruiz left shortly after Estrada returned and, with DEA agents in tail, drove to his Louisville residence.  (*Id.* at pp. 32-33, Sanders Affid. III at pp. 20-21 ¶¶ 27-31.)  This sequence of movements suggested that Ruiz had brought the drugs to Estrada's home; while Ruiz waited, Estrada delivered the package to his buyer, collected the purchase money, and returned; after Estrada and Ruiz split the funds, Ruiz

departed.  (*Ibid*.)  (The DEA agents surmised that Estrada required these elaborate maneuvers so his buyer and supplier would not learn the other's identity.  (*Id.* at pg. 40, Sanders Affid. III at pg. 28 ¶ 63.))  Toll records for Ruiz's phone showed that Ruiz had been in frequent contact during the month of March with Estrada and two drug sources in Mexico, Artiaga and Ledesma.  (*Id.* at pg. 35, 37-38, Sanders Affid. III at pp. 23, 25-26 ¶¶ 40, 50-57.)

### (3)(A) The third wiretap application (Ruiz, April 8, 2016)

Almost as soon as Estrada and Ruiz executed their March 30 deal, the government was back to ask the Court for another wiretap, this time on two of Ruiz's phones.  (Attach. 3, records for WT 16-9 (Sanders "Affidavit III," wiretap on "Target Telephones 2, 3, and 4").)  The Court approved the request on April 8.

The investigation's center of gravity now shifted toward Ruiz. This, in turn, brought Mr. Gonzalez into the agents' view.

### (3)(B) Ruiz buys drugs from Ismael Gonzalez (April 20, 2016)

With DEA agents eavesdropping on Ruiz by means of the third wiretap, he called Ismael Gonzalez on April 20.  (Attach. 4 at pg. 24, Sanders Affid. IV at pg. 14 ¶ 23.)  The agents had not heard anything noteworthy about Mr. Gonzalez for at least nine months; their most recent information came from a source in July 2015, who said he had bought methamphetamine from Mr. Gonzalez for two years starting in 2013.  (*Id.* at pg. 23, Sanders Affid. IV at

pg. 13 ¶ 18.)  Mr. Gonzalez had been arrested for trafficking in April 2015; this case was still pending when Ruiz called him.

Ruiz told Mr. Gonzalez on April 20 that he wanted to buy a pound of methamphetamine; Mr. Gonzalez said he could have one for $6,500.00.  (*Ibid.*)  The men quickly worked out a strategy for the drug transfer: Ruiz would be given directions to a particular location and, upon arrival, would find an unoccupied vehicle waiting with the methamphetamine hidden inside.  (*Id.* at pp. 25-26, Sanders Affid. IV at pp. 15-16 ¶¶ 24-26.)  Within a few hours, Mr. Gonzalez told Ruiz to meet him at an auto repair business in Louisville, and Ruiz – followed by DEA agents – drove to the spot.  (*Id.* at pg. 27-28, Sanders Affid. IV at pp. 17-18 ¶¶ 27-31.)  While Ruiz was en route, Mr. Gonzalez informed him that there would be two pounds of methamphetamine that day, for $11,500.00.  (*Ibid.*)  Agents tracked Ruiz to the repair shop and, after a short wait, watched him leave; the agents followed him in traffic as long as they could, but lost sight of him.  (*Id.* at pg. 28, Sanders Affid. IV at pg. 18 ¶ 31.)  A few hours later, agents listened on the phone as Ruiz told Mr. Gonzalez that he had arrived at the staging location and had found the two-pound package in the vehicle.  (*Id.* at pg. 28, Sanders Affid. IV at pg. 18 ¶ 32.)

The following day, Ruiz was on the phone with Mr. Gonzalez again, this time setting up a meeting at a gas station in Jeffersonville, Indiana.  (Attach. 4 at pg. 29, Sanders Affid. IV at

pg. 19 ¶ 33.)  Investigators put the site under watch and, after Mr. Gonzalez and Ruiz met, the agents followed the two men as they drove to a yacht service business where Mr. Gonzalez was believed to keep a large boat.  (*Ibid.* and *id.* at pg. 35, Sanders Affid. IV at pg. 25 ¶ 49.)  The agents took note that Mr. Gonzalez was driving a silver Chevrolet Impala with temporary registration.  (*Id.* at pg. 39, Sanders Affid. IV at pg. 29 ¶ 56.)

On April 22, investigators obtained a state court order for geo-location data from Mr. Gonzalez's phone.  (Attach. 4 at pg. 39, Sanders Affid. IV at pg. 29 ¶ 57.)  With this information, agents deduced that Mr. Gonzalez resided somewhere within a one-mile radius inside Jeffersontown, though they could not pin down an exact address.  (*Ibid.*)  They also performed periodic drive-by surveillance of an Outer Loop garage where, according to the source in July 2015, Mr. Gonzalez had stored drugs; these efforts had not yet produced results, and the agents were unsure if Mr. Gonzalez had any affiliation with the place.  (*Id.* at pg. 23, 32, 35, Sanders Affid. IV at pp. 13, 22, 25 ¶¶ 18-20, 43, 50.)

There was one more phone call between Ruiz and Mr. Gonzalez, on April 24.  (Attach. 4 at pg. 29, Sanders Affid. IV at pg. 19 ¶ 34.)  The two men discussed a potential transfer of twenty kilograms of methamphetamine from Mr. Gonzalez to Ruiz for a price of $12,000.00 per kilogram, but they did not make specific plans for the date and place of the transaction.  (*Ibid.*)

On May 3 – less than two weeks after Mr. Gonzalez's first appearance in the investigation – the government sought permission to tap his phone.

**(4)(A) The fourth wiretap application (Gonzalez, May 3, 2016)**

This wiretap is the subject and starting point of Ms. Johnson's motion to suppress.  She is one of the people whose conversations with Mr. Gonzalez were recorded after the agents began eavesdropping on Mr. Gonzalez's phone (*see, e.g.*, Attach. 6 at pp. 27, 30, 35, 37, 44, Sanders Affid. VI at pp. 16, 19, 24, 26, 33 ¶¶ 19, 26, 38, 41, 52); this gives her standing to challenge the legality of this wiretap and its later extensions and offshoots. 18 U.S.C. §§ 2510(11) and 2518(10)(a); *United States v. Asker*, No. 15-1832, 676 Fed. Appx. 447, 454-455 (6th Cir. Jan. 18, 2017) (citing *United States v. Cooper*, 868 F.2d 1505, 1509 (6th Cir. 1989).

**(4)(B) The necessity mandate**

The question in this case is whether the affidavit supporting the request for a wiretap on Mr. Gonzalez's phone satisfied the "necessity" requirement: that is, whether it provided "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried, or to be too dangerous." 18 U.S.C. § 2518(1)(c).  When deciding this question, "[o]nly the evidence presented within the four corners of the wiretap application can be used...." *United States v. Gonzalez, Inc.*, 412

F.3d 1102, 1112 (9th Cir 2005) (citing 18 U.S.C. § 2518(3)(c)).  The wiretap rules are to be narrowly construed, *id.* at 1110, and strict compliance is mandatory.  *United States v. Alfano*, 838 F.2d 158, 161 (6th Cir. 1988).  A court must exclude any intercepted call, and all "evidence derived therefrom," if it finds that the communication "was unlawfully intercepted."  §§ 2515, 2518(10)(a).

The necessity mandate is "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."  *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974).  The government has a "responsibility to use promising traditional techniques" before it can qualify for permission to eavesdrop, *Gonzalez, Inc.*, 412 F.3d at 1113; law enforcement officers must "first attempt, without success, traditional methods that may have been 'potentially productive.'" *Id.* at 1114 (quoting *United States v. Ippolito*, 774 F.2d 1482, 1484 (9th Cir. 1985)).  While the government "need not exhaust every conceivable investigative technique," it must at least demonstrate that "ordinary investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time." *United States v. Bennett*, 219 F.3d 1117, 1122 (9th Cir. 2000) (citations omitted).  It is only when "the government has used normal techniques but … has encountered difficulties in penetrating a criminal enterprise or in gathering evidence" that the

balance between individual privacy and law enforcement shifts "to the point where (given the statutory preference for less intrusive techniques) wiretapping becomes reasonable." *United States v. Abou-Saada*, 785 F.2d 1, 11 (1st Cir. 1986).

If ordinary investigative techniques have not already been attempted without success, the necessity test calls for proof that they "reasonably appear to be unlikely to succeed if tried, or to be too dangerous." § 2518(1)(c). "Such a showing must allege specific circumstances that render normal investigative techniques particularly ineffective," a Ninth Circuit case advised, "to prevent the government from making general allegations about classes of cases and thereby sidestepping the requirement that there be necessity in the particular investigation in which a wiretap is sought." *Ippolito*, 774 F.2d at 1486. "[A] purely conclusory affidavit unrelated to the instant case and not showing any factual relations to the circumstances at hand would be, in our view, an inadequate compliance with the statute," wrote the Sixth Circuit: "What is required in addition … is information about particular facts of the case at hand which would indicate that wiretaps are not being 'routinely employed as the initial step in criminal investigation.'" *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977) (*quoting United States v. Giordano*, 416 U.S. 505, 515 (1974)).

A reasonable standard be employed for measuring necessity. The government cannot properly "claim[] a vast investigative

17

purpose" – for example, to gather all "the evidence necessary to identify all the participants in this [drug] trafficking organization…" – and thereby "cast its investigative net so far and so wide as to manufacture necessity in all circumstances." *United States v. Blackmon*, 273 F.3d 1204, 1211 (9th Cir. 2001). "Doing so would render the requirements of § 2518 nullities," the *Blackmon* court said. *Ibid.*

One last principle applies with particular force in our case. "[T]he government is not free to transfer a statutory showing of necessity from one application to another – even within the same investigation." *Gonzalez Inc.*, 412 F.3d at 1115. "Each wiretap application must separately satisfy the necessity requirement." *Ibid.* Thus "[a] suspicion that a person is a member of a conspiracy … is not a sufficient reason to obtain a wiretap." *United States v. Carneiro*, 861 F.2d 1171, 1181 (9th Cir. 1988). "Less intrusive investigative procedures may succeed with one putative participant while they may not succeed with another." *United States v. Santora*, 600 F.2d 1317, 1321 (9th Cir. 1979) (quoting *United States v. Abascal*, 564 F.2d 821, 826 (9th Cir. 1977).

The government's application for a wiretap on Mr. Gonzalez's phone did not abide this rule. On the contrary, this was a hair-trigger wiretap request, based almost entirely on what agents heard on Ruiz's phone and saw on April 20 and 21. Agents did not devote genuine effort to learning more about Mr. Gonzalez via

ordinary investigative methods.  Rather, the government employed a specious "cascading theory of necessity," *see United States v. Garcia-Villalba*, 585 F.3d 1223, 1231-1232 (9th Cir. 2009): instead of directing particularized investigative actions against Mr. Gonzalez, the government sought merely to transplant prior showings of necessity for the Estrada and Ruiz wiretaps onto the new terrain of the Gonzalez investigation.

**(4)(C) The government's application failed to demonstrate that a wiretap on Mr. Gonzalez's phone was a necessity**

The wiretap on Ruiz had very quickly begun to yield incriminating statements by Mr. Gonzalez, and investigators supplemented their eavesdropping with traditional surveillance to track the actions of the two men during the April 20 drug transaction.  The Ruiz wiretap had, in short, been devastatingly effective against Mr. Gonzalez in just its first few weeks of operation.  Considered as an investigative technique the agents could continue to command in their operations against Mr. Gonzalez, the Ruiz wiretap certainly had not exhausted its usefulness.  Indeed, that wiretap was so new that investigators had hardly begun to exploit it, let alone exhaust it; the Ruiz wiretap's immediate productivity gave every indication that it would continue to generate useful evidence for some time to come.

As of April 2016, Mr. Gonzalez had been off the investigators' radar for many months.  In some contexts, a long empty stretch of

19

this kind might indicate that ordinary investigative techniques were incapable of penetrating the suspect's defenses.  Not here, though; the agents had not uncovered anything new about Mr. Gonzalez because they hadn't been looking for anything new for many months.  When events on April 20 spurred the agents into action, though, they were able quickly to learn the make, model, and registration number of the automobile Mr. Gonzalez was driving; they knew that a particular auto repair business in town had played (and might continue to play) a facilitating role in Mr. Gonzalez's activities; they began spot checks of a building that Mr. Gonzalez had reportedly used for drug storage in the past; they started collecting and analyzing geo-location data from Mr. Gonzalez's phone; and they began scrutinizing Mr. Gonzalez's toll records.  These traditional investigative techniques had not produced a great deal of evidence, but they had only been in use for thirteen days when the government sought its wiretap on Mr. Gonzalez.   The modest yield of these ordinary detection tools indicated only that they needed more time to work, not that they had "been tried and failed" or they were "reasonably … unlikely to succeed if tried."

The government's evidence that a wiretap on Mr. Gonzalez was a "necessity" thus consisted of a catalogue of the inherent limitations of each traditional investigative technique, rather than a demonstration that the techniques had already failed in

application or that they could not generate any useful information. Consider these examples:

**Use of confidential sources:** "The LDO [Louisville District Office of the DEA] has had no success introducing Confidential Sources or Undercover Officers into the Gonzalez DTO," Agent Sanders's affidavit reports. (Attach. 4 at pg. 32, Sanders Affid. IV at pg. 22 ¶ 42.)  Such efforts in the past had borne fruit, of course: the confidential source in July 2015 had shown that people close to Mr. Gonzalez could be persuaded to divulge highly incriminating information about his operations. (*See ibid.*)  The affidavit's silence about new efforts to contact their prior confidential source or to develop a new source demonstrates only that the investigators had not tried to do these things.  The affidavit primarily offers a despairing critique of the typical drug trafficker's reluctance to "divulge other members of the DTO locally or his source of supply, especially to someone relatively unknown to them," and laments that confidential sources therefore cannot always "identify[] the full scope of the DTO, its members and methods, … sources of supply, distribution routes, cell heads, other local distributors, and similar information…." (*Id.* at pg. 33, Sanders Affid. IV at pg. 23 ¶ 44.) Given the paucity of effort devoted thus far to currying a confidential source, and given that a confidential source could surely provide at least *some* useful information about Mr. Gonzalez (if, granted, not *everything* an investigator would want to know),

the affidavit rings hollow when it declares categorically that "[t]here is no indication that intelligence regarding the DTO would improve minus the interception" of Mr. Gonzalez's phone calls.  (*Id.* at pg. 32, Sanders Affid. IV at pg. 22 ¶ 43.)

**Physical surveillance:**  Agent Sanders's affidavit recounts the surveillance efforts in the two weeks preceding the new wiretap request, including the observation of two meetings between Mr. Gonzalez and Ruiz, a temporary shadowing of Mr. Gonzalez's car in traffic, and several passes by a suspected storage facility. (Attach. 4 at pp. 34-35, Sanders Affid. IV at pp. 24-25 ¶¶ 48-50.) The affidavit did not report that Mr. Gonzalez had actually spotted any of these investigative efforts; nevertheless, the affidavit insisted that "it is extremely difficult to conduct surveillance of major drug traffickers over an extended period of time without detection."  (*Id.* at pg. 35, Sanders Affid. IV at pg. 25 ¶ 51.)  The affidavit drew an unfavorable comparison between surveillance as a stand-alone technique and surveillance enhanced by a wiretap: the former can "confirm meetings and other suspected activities," but generally cannot "prove the purpose of the meetings and other activities;" with the help of eavesdropping on the suspect's phone calls, though, surveillance efforts provide "valuable proof of the criminal activities involved."  (*Ibid.*)  Considered in isolation, "physical surveillance is unlikely to establish conclusively the roles of the named conspirators or to identify additional conspirators," Agent

Sanders wrote, and "[e]ven if DEA engaged in further surveillance, it is unlikely that the surveillance alone would accomplish the goal of this investigation." (*Id.* at pg. 36, Sanders Affid. IV at pg. 26 ¶¶ 52-53.)

**Toll analysis**:  Mr. Gonzalez's toll records had already disclosed the telephone number of a key collaborator, but Agent Sanders's affidavit complained that toll information does not provide evidence "as to the substance of the conversations, or any certainty as to the exact identities of the actual conversants of the captured telephone calls." (Attach. 4 at pg. 37, Sanders Affid. IV at pg. 27 ¶ 54.)  The affidavit also observed that subscriber information for particular phone numbers is often undependable – users do not always provide their true names and addresses when acquiring phones, and sometimes these details are missing altogether. (*Ibid.*)  The affidavit says in this regard that "[t]o date, the LDO has received no accurate subscriber information for numbers in contact with" Mr. Gonzalez's phone (*ibid.*), but this leaves many mysteries – for instance: had the investigators even asked for subscriber information yet?  The affidavit doesn't say so, and it might reasonably be doubted: after all, Mr. Gonzalez's toll records had not been requested until April 25, barely a week before the affidavit was written. (*See id.* at pg. 29, Sanders Affid. IV at pg. 19 ¶ 35.)  Had the investigators gathered subscriber information for every phone number on Mr. Gonzalez's toll records (there were

2,403 calls listed) and confirmed that every single account had false names and addresses?  The affidavit doesn't say so, and it seems highly unlikely that the agents had done so much in so little time (or if they had, that the affidavit should omit all mention of it); nevertheless, that is what the affidavit suggests when it says investigators had "received no accurate subscriber information."

**Other investigative techniques**:  The narrative conventions seen in the prior sections repeat themselves with regularity throughout the rest of the affidavit: each new investigative procedure is dismissed because it hadn't paid dividends yet or because it could not provide conclusive and all-encompassing proof of anyone's guilt.  The affidavit says that the installation of a tracking device on Mr. Gonzalez's car "has not been implemented," for instance, because officers had not "been able to locate Gonzalez with any regularity" (Attach. 4 at pg. 39, Sanders Affid. IV at pg. 29 ¶ 56) – but agents had already followed Mr. Gonzalez as he drove a white Impala with a temporary tag, and it had been only eleven days since they first observed the vehicle.  Geo-location tracking data from Mr. Gonzalez's phone was being fed to investigators, and had already confirmed that Mr. Gonzalez maintained a residence in Jeffersontown, but "this … data has been of little value," the affidavit protests, "as the variance of this information has been upwards of 1800 meters…."  (*Id.* at pg. 39, Sanders Affid. IV at pg. 29 ¶ 57.)   There had been no trash searches attempted because

investigators hadn't yet determined Mr. Gonzalez's home address. (*Id.* at pg. 40, Sanders Affid. IV at pg. 30 ¶ 61.)  The affidavit was pessimistic that the technique would ever work, because "many high level drug traffickers … go to great lengths" to avoid keeping incriminating evidence close to home (*id.* at pg. 41, Sanders Affid. IV at pg. 31 ¶ 62); but, given the failure thus far to find Mr. Gonzalez's residence, there was no concrete indication that he had the same habits as "many high level drug traffickers."

* * * * *

The Supreme Court long ago warned that "[f]ew threats to liberty exist which are greater than that posed by the use of eavesdropping devices."  *United States v. Berger*, 388 U.S. 41, 63 (1967).  The necessity requirement "is the keystone of congressional regulation of electronic eavesdropping," *United States v. Carter*, 449 F.3d 1287, 1292 (D.C. Cir. 2006); the rule "evince[s] [Congress's] clear intent to make doubly sure that the statutory authority be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications." *United States v. Giordano*, 416 U.S. 505, 515 (1974).  The government violated the rule in this case, and Ms. Johnson asks the Court to suppress the illegally-intercepted communications and all evidence derived from those communications.

Respectfully submitted,

*Michael R. Mazzoli*

Scott C. Cox
Michael R. Mazzoli
Attorneys for Defendant Johnson
COX & MAZZOLI PLLC
600 West Main Street, Suite 300
Louisville, Kentucky 40202
502-589-6190
MazzoliCMLaw@aol.com

## CERTIFICATE OF SERVICE

On July 21, 2017, I electronically filed this document through the ECF system, which will send a notice of electronic filing to counsel of record.

*Michael R. Mazzoli*

Michael R. Mazzoli