UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

ELECTRONICALLY FILED

| | |
|---|---|
| UNITED STATES OF AMERICA | PLAINTIFF |
| v. | CRIMINAL ACTION NO. 3:16-CR-00082-7-DJH |
| JOLIE JOHNSON et al. | DEFENDANTS |

### DEFENDANT JOLIE JOHNSON'S REPLY IN SUPPORT OF HER MOTION TO SUPPRESS WIRETAP EVIDENCE

On May 3, 2016, the government requested a wiretap on the phone of Ismael Gonzalez. This happened less than two weeks after detectives pursuing the Yamil Estrada-Ricardo Ruiz drug organization first encountered Mr. Gonzalez, on April 20, 2016, when he and Ruiz arranged a methamphetamine sale.

All sides agree that, when the investigators sought the May 3 wiretap on Mr. Gonzalez, it was incumbent on them to establish that the wiretap was necessary, as measured by the standard of 18 U.S.C. § 2518(1)(c). (*See* R. 149, Johnson Mot. at pp. 15-19, Page ID # 487-491; R. 164, U.S. Resp. at pp. 5-7, Page ID # 1069-1071.) As applied in our case, the salient question is whether, in the thirteen days between the Gonzalez-Ruiz drug deal and the May 3 wiretap, "other investigative procedures" directed at Mr. Gonzalez had "been tried and failed" or such procedures were, by May 3, demonstrably "unlikely to succeed" or "too dangerous" to try. § 2518(1)(c). Expressed another way, the question is whether, in the days between April 20 and May 3, the detectives sufficiently applied "ordinary investigative techniques employing a

normal amount of resources" in the effort to "make the case [against Mr. Gonzalez] within a reasonable period of time," *United States v. Bennett*, 219 F.3d 1117, 1122 (9th Cir. 2000), or encountered "specific circumstances that render[ed] normal investigative techniques particularly ineffective…." *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1985).

The government's response clarifies a key variable in the necessity test in our case: the *objective* of the investigation for which the May 3 wiretap was purportedly necessary. The objective provides an important dimension for measuring the efficacy and potential of various law enforcement techniques. Tools that are sufficient to gather evidence against a street-level drug dealer may be inadequate when the investigative target is the large drug trafficking organization that employs the street-level dealer; a wiretap on the dealer would be unnecessary to investigate the dealer himself, but might be justifiable under the necessity test if the objective is the large organization.

The government's response advises the Court that, for purposes of the May 3 wiretap on Mr. Gonzalez, "[t]he goal of the Gonzalez wiretap was to prosecute members of Gonzalez's organization." (R. 164, U.S. Resp. at pg. 15, Page ID # 1079.) The May 3 wiretap was therefore not a new stage of the longstanding investigation into the Estrada-Ruiz drug trafficking business, but was part of a fundamentally *new and independent* investigation of Mr. Gonzalez. The government seems to concur that a new wiretap on Mr. Gonzalez was not necessary to the success of the Estrada-Ruiz investigation; after all, the tools already available to agents pursuing the Estrada-Ruiz business had proved fully

2

sufficient to reveal Mr. Gonzalez's interaction with that business.  (*See ibid.*)  The focus, therefore, is not whether the May 3 wiretap was necessary for the Estrada-Ruiz investigation, but whether it was necessary for gathering proof about *Mr. Gonzalez's business*.  As the government's response asserts, the fact that "the Ruiz wiretap had already been successful in providing incriminating information about Gonzalez conflates Gonzalez's criminal activity with that of the entire drug trafficking organization."  (*Ibid.*)

In harmony with this differentiation between the two drug trafficking organizations, Agent Sanders's affidavit for the May 3 wiretap request consistently distinguishes "the Gonzalez DTO" from the Estrada-Ruiz operation.  For instance, the affidavit says that the investigators had had "no success in introducing Confidential Sources or Undercover Officers into the GONZALEZ DTO."  (R. 149-4, Sanders Affid. IV at pg. 22 ¶ 42, Page ID # 721.)  This, of course, was not true of the Estrada-Ruiz investigation: quite early in the case, agents cultivated a confidential source who made several major drug purchases from Estrada in January and February 2016, and an undercover DEA agent had intercepted a large cash payment from Estrada by posing as a courier for Estrada's connection in New York.  (R. 149-1, Sanders Affid. I at pp. 9-11 ¶¶ 21-29, ¶ 37, ¶¶ 42-61, Page ID # 518-527.)  In a similar vein, Agent Sanders writes that Mexican drug dealer Antonio Ledesma, interviewed by detectives in August 2014, "was not able to provide any details regarding the GONZALEZ DTO" (R. 149-4, Sanders Affid. IV at pp. 32-33 ¶ 66, Page ID # 731-732); by contrast, Ledesma talked to the agents in some detail about Ruiz, and investigators strongly suspected that Ledesma was still

3

supplying large amounts of drugs to Ruiz and Estrada. (R. 149-3, Sanders Affid. III at pp. 12 ¶¶ 16-17, pp. 18-19 ¶¶ 24-25, pg. 22 ¶¶ 34-36.)

The shift in perspective from the Estrada-Ruiz business to the Gonzalez organization is important. The information that agents gathered about Estrada and Ruiz prior to May 3 was not prologue for the wiretap on Mr. Gonzalez, but a separate investigation altogether. This could not have been immediately obvious to the Court when it considered the wiretap application on May 3; after all, the affidavit in support of the wiretap request was designated "Affidavit IV" in DEA Special Agent Brian Sander's two-month-old series of applications. In reality, though, the affidavit was the first in a new line, offered in support of "Wiretap One" in an investigation of the "Gonzalez organization," an investigation that had been under way for less than two weeks.

This changes the framework for considering the amount and quality of investigative groundwork carried out prior to the May 3 wiretap request. The failure or exhaustion of non-wiretap procedures against the Estrada-Ruiz organization have little, if any, relevance to the question of whether a wiretap was necessary for investigating the Gonzalez organization. This hurts the government's position here, because investigators did much preliminary work before requesting wiretaps on Estrada and Ruiz. It serves to remember that, before they sought their first wiretap against Estrada, agents had determined that his business had a supplier in Mexico; they had identified several important local operatives handling various jobs; they had learned that Estrada had a major connection in New York; they had scored considerable successes

with a confidential informant and an undercover agent; they knew where Estrada lived and stored drugs, and had attempted several trash searches at his house. (*See* R. 149, Johnson Mot. at pp. 3-5, Page ID # 475-477.) Ruiz was targeted for a wiretap just a few weeks after he first called Estrada, but investigators had steadily been gathering evidence against him for two years; in the course of those efforts, agents had connected Ruiz with several major drug dealers, installed a pole camera outside his house, and hidden a location tracker on his car. (*See id.* at pp. 8-9, Page ID # 480-481.) Agents had also tried numerous other investigative techniques against Estrada and Ruiz, but these had not been fruitful. (*See, e.g., id.* at pg. 5, Page ID # 480.) Thus, when the government requested wiretaps against Estrada and Ruiz, it could plausibly claim that the investigators had gathered about as much information as traditional tools could provide.

But the agents had barely used, let alone exhausted, these traditional techniques before seeking the May 3 wiretap against Mr. Gonzalez. (*See* R. 149, Johnson Mot. at pp.19-25, Page ID # 491-497.) Prior to Mr. Gonzalez's April 20, 2016 transaction with Ruiz, the government's most recent information about his drug sales was almost a year old. (The source for that information had been in jail since July 2015 on federal drug trafficking charges in the Eastern District of Kentucky; more about this case in a moment. *See United States v. James R. Muse et al.*, Case No. 6:15-CR-00033-GFVT (E.D. Ky.).) In the two weeks following Mr. Gonzalez's deal with Ruiz, agents had not been able to determine his place of residence, and this in turn had prevented them from considering such investigative tools as pole cameras and trash

5

searches (techniques already employed against Estrada and Ruiz). The failure to locate Mr. Gonzalez's residence hardly seems a testament to "the sheer difficulty of finding his actual address" (R. 164, U.S. Resp. at pg. 13, Page ID # 1077) so much as an admission that the investigators had not put enough time and effort into the project: indeed, in just another few weeks, Agent Sanders knew exactly where Mr. Gonzalez was living, and he acquired this information without any apparent assistance from the wiretap on Mr. Gonzalez's phone. (*See* R. 149-6, Sanders Affid. VI at pp. 37-38 ¶ 63, Page ID # 852-853.)

Many useful sources of information about Mr. Gonzalez apparently went unexplored in the two weeks leading up to the May 3 wiretap request. For instance, a search for Mr. Gonzalez's name in the Kentucky Secretary of State's database would have revealed Mr. Gonzalez's connection to Fly Express LLC, a company he formed in March 2016 with his brother, Odneil; a search for Odneil's name would have disclosed Trans Naga Transportation LP, a company whose registered agent was Mr. Gonzalez's girlfriend, Maricela Guerra Botiel, a resident of Jeffersontown (a place where geo-location data had frequently put Mr. Gonzalez).[1] A query in the Kentucky judiciary's case tracking system would have revealed that the record for Mr. Gonzalez's ongoing Jefferson

---

[1] The Kentucky Secretary of State's business search application can be found at https://app.sos.ky.gov/ftsearch/. Records for Fly Express are located at https://app.sos.ky.gov/ftshow/(S(sg3vnwp03a0efm0klah5jrt1))/default.aspx?path=ftsearch&id=0947620&ct=06&cs=99999; records for Trans Naga are located at https://app.sos.ky.gov/ftshow/(S(5l51yafgdee3dn51vfqghkj4))/default.aspx?path=ftsearch&id=0896551&ct=16&cs=99999.

6

County prosecution contained two Louisville addresses for him; a different record, concerning a Spencer County boating violation, would have disclosed a vessel registration number (agents suspected Mr. Gonzalez was keeping a yacht in Jeffersonville, Indiana) and the name of a state Fish and Wildlife investigator familiar with the case. (*See* Attach. 1, state court docket listings; *see also* R. 149-4, Sanders Affid. IV at pg. 25 ¶ 49.)  A Google search would have linked investigators to records containing Mr. Gonzalez's United States Department of Transportation identification number, which in turn referred to an Outer Loop address that Mr. Gonzalez had allegedly used for drug storage in years past.[2]  From all that appears in Agent Sanders's affidavit, investigators considered none of this before asking the Court for a wiretap on Mr. Gonzalez's phone.

There was also the ongoing federal prosecution of James Ronald Muse in the Eastern District of Kentucky.  If Agent Sanders's affidavit is any guide, Muse was the only person who had ever spoken with law enforcement officers about first-hand dealings with Mr. Gonzalez. (*See* R. 149-4, Sanders Affid. IV at pp. 12-14 ¶¶ 17-22, Page ID # 711-712.) Agent Sanders's account of Muse's interview leaves out the fact that the subject matter of their conversation – Muse's drug sales with Mr. Gonzalez and his brother Odneil – was also the subject matter of the federal charges pending against Muse in the London Division.  Agent Sanders's affidavit similarly omits the fact that Mr. Gonzalez was a target

---

[2]   The DOT information can be found at http://www.motorcarriersalliance.org/1506359/ismael-gonzalez.  *See also* R. 149-4, Sanders Affid. IV at pg. 13 ¶ 20, Page ID # 712 (referring to 1214 Outer Loop address).

7

for prosecution in the Eastern District case; as it happened, Mr. Gonzalez and his brother were secretly indicted in that case on June 23, 2016. (*See United States v. Muse*, Case No. 6:15-CR-00033-GFVT (E.D. Ky.), R. 92, Third Superseding Indictment, and R. 94, Order granting motion to seal indictment.) Indeed, when Agent Sanders submitted his last wiretap request for Mr. Gonzalez, on June 29, 2016, his affidavit said nothing about the federal charges then pending against Mr. Gonzalez. (*See* R. 149-8, Sanders Affid. VIII at pg. 40 ¶ 83, Page ID # 1013.) It was only after Mr. Gonzalez was arrested for the charges in this Court that the Eastern District indictment was unsealed. (*See Muse*, R. 112, U.S. Mot. to Unseal Indictment, and R. 113, Order granting motion to unseal.) These omissions from Agent Sanders's affidavits about the Eastern District of Kentucky prosecution must have been intentional; the most minimal coordination between Agent Sanders and DEA Special Agent Gregory Bunch, the case agent for the London prosecution, would have been enough to keep Agent Sanders informed of the pending charges.

It is therefore hard to believe, given all the sophisticated resources available to United States law enforcement officers, in a modern world where people leave electronic traces of their activities wherever they go and whatever they do, that trained federal investigators could not locate the target of pending federal criminal charges using "ordinary investigative techniques employing a normal amount of resources … within a reasonable period of time." *Bennett*, 219 F.3d at 1122. At least in the current case, the government's lament about "the sheer difficulty

8

of finding [Mr. Gonzalez's] actual address" rings hollow, considering the apparent lack of effort invested in the task.

It is instructive to conclude by examining the findings of a district judge who confronted a case bearing many similarities to the present one. *United States v. Landeros-Lopez*, 718 F.Supp.2d 1058 (D. Ariz. 2010). The government in *Landeros-Lopez* had conducted a six-month investigation before seeking a wiretap on a man suspected of running a marijuana shipping business in Phoenix. *Id.* at 1059-1060. On their first day monitoring the target's phone calls, investigators heard a conversation in which the other person, known only as "Juan," revealed himself to be the target's drug supplier. *Id.* at 1060. Eleven days later, the agents sought a wiretap on "Juan." *Ibid.* "While it is true that investigators had conducted substantial investigation into the activities of [the first target] before seeking the Juan wiretap," the court said, "that investigation was not sufficient to show that traditional techniques had been tried unsuccessfully against Juan." *Id.* at 1063. The few traditional techniques that had been employed against "Juan" "had not been tried for 'a reasonable period of time,'" *id.* at 1064-1065 (quoting *Bennett*, 219 F.3d at 1122), and even in the truncated eleven-day period, some of the techniques had "borne substantial fruit," such as clues about "Juan's" identity and his connections to other members of the marijuana shipper's organization. *Id.* at 1065. The government had claimed a far-ranging objective in its wiretap request – "not only a desire to find and successfully prosecute all members of the Juan drug trafficking organization, but also a desire to obtain substantial information about the organization's techniques, methods, and

9

practices," as the court described it – but "[s]uch a broad purpose, supported only by a discussion of generic shortcomings in traditional law enforcement techniques, does not establish necessity...." *Id.* at 1067. Properly considered, "the investigation of Juan was in its early stages and traditional techniques were bearing fruit" when the agents sought the wiretap, and thus "[i]t simply was not truthful to suggest that traditional techniques had been tried for a reasonable period of time without success, [or] … that such techniques were unlikely to succeed." *Id.* at 1069.

"Necessity is not a mere technicality," the court observed. *Landeros-Lopez*, 718 F.Supp.2d at 1069. "Wiretaps are among the most intrusive of investigative tools, and Congress appropriately has concluded that they should be used only when truly necessary." *Ibid.* "Although it may always be said that traditional techniques have limited utility against sophisticated drug trafficking organizations," the court recognized, "this fact does not establish necessity. The government must use traditional techniques without success or must explain, on the basis of facts specific to the case at hand, why they would not work." *Ibid.* "The government in this case did neither," the court concluded. *Ibid.*

The same must be said in our case. The government failed to establish that the May 3 wiretap on Mr. Gonzalez was necessary, and Ms. Johnson accordingly renews her request that the Court suppress the wiretap's unlawfully intercepted communications and all "evidence derived therefrom."

Respectfully submitted,

*Michael R. Mazzoli*

Scott C. Cox
Michael R. Mazzoli
Attorneys for Defendant Johnson
COX & MAZZOLI PLLC
600 West Main Street, Suite 300
Louisville, Kentucky 40202
502-589-6190
MazzoliCMLaw@aol.com

## CERTIFICATE OF SERVICE

On September 1, 2017, I electronically filed this document through the ECF system, which will send a notice of electronic filing to counsel of record.

*Michael R. Mazzoli*

Michael R. Mazzoli