```
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF KENTUCKY
 2                        LOUISVILLE DIVISION

 3    UNITED STATES OF AMERICA,      )    Case No. 3:16-CR-082
                                     )
 4            Plaintiff,             )
                                     )
 5    v.                             )
                                     )
 6    DANTE DEWAYNE WATTS AND        )
       CARLOS CATALAN               )
 7                                   )    December 18, 2019
              Defendants.           )    Louisville, Kentucky
 8
                                  *  *  *  *  *
 9         TRANSCRIPT OF TESTIMONY OF JOSEPH STANSFIELD
                        AT JURY TRIAL
10         BEFORE HONORABLE CLARIA HORN BOOM
                UNITED STATES DISTRICT JUDGE
11                                *  *  *  *  *

12    APPEARANCES:

13    For United States:       Robert B. Bonar
                               Amy Sullivan
14                             U.S. Attorney's Office
                               717 West Broadway
15                             Louisville, KY 40202

16    For Defendant            Frank Mascagni, III
      Dante Dewayne Watts:     228 S. Seventh Street
17                             Louisville, KY 40202

18    For Defendant            Christie A. Moore
      Carlos Catalan:          Lincoln J. Carr
19                             Bingham Greenebaum Doll LLP
                               101 S. Fifth Street
20                             Suite 3500
                               Louisville, KY  40202
21
      [Defendants present.]
22
                          Rebecca S. Boyd, RMR, CRR
23                         Official Court Reporter
                            232 U.S. Courthouse
24                         Louisville, KY 40202
                             (502) 625-3777
25    Proceedings recorded by mechanical stenography, transcript
      produced by computer.
```

```
1         (Begin proceedings in open court at 1:34 p.m.)

2              (Jury in.)

3         THE COURT:  All right.  Welcome back, ladies and

4    gentlemen of the jury.  The United States may call its next

5    witness.

6              MS. SULLIVAN:  Yes, Your Honor.  The United States

7    calls Agent JR Stansfield.

8         (JOSEPH STANSFIELD, called by Plaintiff, sworn.)

9                        DIRECT EXAMINATION

10   BY MS. SULLIVAN:

11   Q.  Good afternoon, Agent Stansfield.

12   A.  Good afternoon.

13   Q.  Could you please introduce yourself for the jury?

14   A.  Sure.  My name is Joseph Stansfield.  I am a supervisory

15   special agent with IRS criminal investigation division.  I have

16   held this position since April of this year.  However, prior to

17   becoming a supervisor, I was a criminal investigator with the

18   IRS for around 13 years, and the bulk of my time spent on this

19   case was as a criminal investigator for the IRS.

20   Q.  And for this case, what was your role in this case?

21   A.  My role was to examine all the financial aspects of this

22   case.  I was looking at a complete financial picture for Mr.

23   Watts, including reviewing financial records, reviewing bank

24   records, reviewing tax records, conducting interviews, reviewing

25   casino records, reviewing asset purchase records, and trying to
```

1  determine how much money that Mr. Watts would have had access to

2  during -- at the investigative time period, and what that money

3  was used for.

4  Q.  Agent Stansfield, you have on your -- in your podium, you

5  have Exhibits 98, 101, and 103.  Will you please look at those?

6  A.  Yes.  I can see those.

7  Q.  Okay.  Can you identify those?  Do you recognize these?

8  A.  I do.

9  Q.  Okay.  Can you tell the jury about those --

10 A.  Sure.

11 Q.  -- please?

12 A.  Exhibit 98 is a copy of a 2015 federal tax return that was

13 filed by Mr. Watts for tax year 2015.  Exhibit 99 is a summary

14 that I prepared that shows the total amount of expenditures that

15 Mr. Watts had during 2015 and 2016.

16     Exhibit 101 is a -- it's a copy of a disc that contains

17 roughly 4,000 pages of documents that I reviewed that went into

18 the summary that I prepared.  It contains financial records.  It

19 contains property -- properties that were purchased.  It

20 contains casino records.  It contains bank records that I

21 reviewed.  So, essentially, all the evidence that I reviewed

22 that went into preparing this summary that is Government Exhibit

23 99 is included on this disc that's Exhibit 101.

24 Q.  And do the --

25 A.  And then --

1   Q.  Go ahead.  Sorry.

2   A.  And then Exhibit -- Government Exhibit 103 is a certified

3   claim that was filed by Mr. Watts.  This was done after currency

4   was seized, and other properties were seized from Mr. Watts on

5   July 2nd, 2016.  He subsequently filed this claim stating that

6   he had ownership interest in various aspects of currency that we

7   seized as well as properties that were seized.

8   Q.  With respect to Exhibit 98, does that also include tax

9   return information for 2015?

10  A.  It does.

11  Q.  Or for both 2015 and both --

12  A.  It includes --

13  Q.  -- 2016?

14  A.  -- a tax return that was filed for 2015 as well as tax

15  information that related to the 2016 year.

16  Q.  Okay.  And that's with respect to what Dante Watts has

17  filed?

18  A.  That's correct.

19  Q.  Okay.  Turning your attention back to 101.  Did you review

20  the records on those -- that DVD?

21  A.  Yes, I did.

22  Q.  Okay.  And how do you know that?

23  A.  I know that because I was given a copy of this disc and all

24  the records that is included on this disc, and I verified that

25  the records that I reviewed that went into the summary chart

1    that I prepared is, in fact, included on this disc, and so I do

2    certify that the records I reviewed are, in fact, included on

3    this disc.

4    Q.   In addition to the casino records that you reviewed that are

5    on that disc, did you also look at CTRs, and can you please

6    explain to the jury what that is?

7    A.   Sure.   A CTR is a currency transaction report, and that is a

8    report that is filed by a financial institution or a casino

9    anytime that anyone provides or deposits more than $10,000 in

10   cash or withdraws or receives more than $10,000 in cash.

11       So those institutions are legally required to file a

12   currency transaction report, and there were many of those

13   records that are also included on this disc that I reviewed that

14   became a part of the summary that is part of Government Exhibit

15   99.

16   Q.   Agent Stansfield, you testified, how long have you been an

17   agent?

18   A.   For 13-plus years.

19   Q.   Okay.   So you've done -- conducted a number of financial

20   investigations?

21   A.   Yes, I have.

22   Q.   With respect to the records that are on this disc, and also

23   in Exhibit 98, are you familiar with these types of records?

24   A.   Absolutely.

25   Q.   Are these the type of records that these businesses or

1    casinos, are CTRs property records that are kept in the ordinary

2    course of business?

3    A.   Yes, they are.

4    Q.   Okay.  And these are the kind of records that you would

5    normally obtain in financial investigations?

6    A.   Yes, they are.

7    Q.   Okay.  And have all of these records been certified as

8    authentic or true -- and true by various businesses from whom

9    you obtained them?

10   A.   Yes.

11   Q.   Okay.  All right.  Agent Stansfield, do you also have -- is

12   Exhibit 99 in front of you?

13   A.   Yes, I do.

14   Q.   And I believe you -- if you could just state again what that

15   is.

16   A.   Sure.  This is a chart or a summary that I did that

17   summarizes all of the expenditures that Mr. Watts had during May

18   2015 through July of 2016.  And this kind of a chart is really

19   important when you're dealing with someone who engages in

20   significant cash activity.

21   Q.   Okay.  If I can interrupt you --

22   A.   Sure.

23   Q.   -- just for a minute.  Does Exhibit 99 fairly and accurately

24   summarize the documents that are in Exhibits 98, 101, and 103?

25   A.   Yes.

1          MS. SULLIVAN:  Okay.  Your Honor, all of the records

2     in Exhibits 98, 101, and 103 have been delivered to defense

3     counsel in discovery, and we move to admit Exhibit 99 and

4     publish to the jury.

5          THE COURT:  All right.  Any objection?

6          MR. MASCAGNI:  No objection to Exhibit 99.

7          MS. MOORE:  No objection.

8          THE COURT:  All right.  It is admitted.

9          (Government's Exhibit 99 admitted in evidence.)

10         MS. SULLIVAN:  May we publish to the jury, Your Honor?

11         THE COURT:  Oh, yes, you may.

12         MS. SULLIVAN:  Thank you.

13    Q.  Okay.  Agent Stansfield, could you please explain to the

14    jury how -- the chart, please?

15    A.  Sure.  This is -- again, this is a summary of the total

16    expenditures that Mr. Watts had that we were able to identify

17    during the time period of May 2015 through July of 2016.

18        This -- as I've mentioned before, this is very critical --

19    this type of chart is extremely important when you are

20    investigating someone who engages in significant cash activity.

21    There's really no other way to determine just how much money

22    someone received during this time period if we didn't look at

23    all of the expenditures.

24        And this -- that number that you see in the middle is a

25    combination of those different categories that make up his total

1    expenditures amount.

2    Q.   Okay.

3    A.   And this was -- this was determined by reviewing, again, all

4    of the -- his financial records, bank records, casino records,

5    casino records were a big part of this, currency transaction

6    reports, property records, all of those types of records as well

7    as conducting interviews and various other evidence that I have

8    obtained and reviewed.

9    Q.   So if we start with the first category.  That's the

10   properties category.  From your examination of real property

11   records and bank records, what did you find for the time period

12   of May 2015 through July 2016?

13   A.   I found that Mr. Watts purchased one property.  It's a house

14   located at 12600 Blackthorn Trace.  It was purchased in May of

15   2016.  The sales price of that was roughly 260,000, and during

16   this time period, he put roughly $72,000 down as a down payment

17   to purchase that house.

18   Q.   And you were able to trace those funds to Mr. Watts?

19   A.   Yes, I was.

20   Q.   Okay.  Could you please tell the jury about the cash

21   withdrawals, and what that means?

22   A.   Yeah.  The cash withdrawals, this really pertains to one

23   cash withdrawal, during this particular time period, that

24   occurred in November of 2015.  This was a cash withdrawal that

25   was outside of any of the casino activity that he was involved

1  in, so this was not a cash withdrawal at any of the casinos.  It

2  was one $15,000 cash withdrawal that came out of his bank

3  account in November of 2015.

4  Q.  Could you tell the ladies and gentlemen of the jury about

5  the casino cash purchases portion of this summary?

6  A.  Yeah.  The casino cash purchases, this number consists of a

7  summary of all of the casino chips, the amount of money that was

8  used to purchase casino chips during this time period.  You can

9  see that number is about 3.5 million, and all of that was done

10  with cash.

11      The bulk of his gambling activity, during this time period,

12  occurred at the Tropicana Casino in Evansville, Indiana.  So

13  that number consists of -- I looked at currency transaction

14  reports and casino records that were filed by Tropicana as well

15  as records that were filed by French Lick Casino.  He did a

16  little bit of gambling at French Lick Casino during this time

17  period.  As well as records that came from the Las Vegas Sands

18  Casino, and records also obtained from Belterra, Hollywood

19  Casino, and Rising Star Casino.

20      But the bulk of this gambling activity that you see here was

21  at the Tropicana in Evansville, Indiana.  And, essentially, what

22  that number shows is that during May 2015 through, actually,

23  April of 2016, so you're talking about roughly about a year time

24  period, there was more than 3.5 million in cash that was used to

25  purchase casino chips during that time period, and that's --

1   that was based on my review of an inordinate amount of gambling

2   activity that -- and based upon my review of the casino records

3   that we obtained as well as currency transaction reports and

4   financial records.

5   Q.   Were there CTRs filed when Mr. Watts would cash out his

6   chips at the end of the day or anytime he would cash them out?

7   A.   There were.  There were currency transaction reports that

8   were filed when he would redeem his chips for cash, and when he

9   walked out of the casino and redeemed those chips for a certain

10  amount, if that certain amount exceeded $10,000, which, in his

11  case, it almost always did, there were currency transaction

12  reports that were filed.

13       So what I found during this time period, and my analysis was

14  based off looking at his daily gambling activity, and how much

15  money he walked in with at the end of this entire time period,

16  which was 3.5 million, well, there were also around two million

17  in currency transaction reports that were issued for his

18  redemption of chips.

19       So he went in, and he purchased $3.5 million worth of chips

20  in cash and walked out with -- or he redeemed those chips for

21  roughly two million dollars in cash over that entire time

22  period.  So that is looking at from May of 2015 through April of

23  2016.

24  Q.   Other than what is in your summary, are you aware of any

25  significant casino gambling activity that Mr. Watts engaged

1  in --

2  A.  No --

3  Q.  -- during that --

4  A.  -- I'm not.

5  Q.  -- time period?  Okay.  Did you see evidence and casino

6  records that Mr. Watts won significant sums in that time period?

7  A.  No, I did not.  In fact, during that time period, he

8  actually lost significant money.  As I mentioned before, if

9  you're looking at cash in and cash out, the cash that went in

10  was roughly $3.5 million during that time period.  The cash that

11  came out is roughly two million dollars.

12  Q.  Can you please tell the jury about the account seizure in

13  this case?

14  A.  Sure.  On July 8th, which was just a few days after the

15  search warrants and the other currency seizures, there was a

16  seizure out of Mr. Watts' account for roughly $89,000.  That

17  came from his Kentucky Telco account.  So he had -- he had bank

18  accounts at PNC Bank and bank accounts at Kentucky Telco.

19      At this time that this seizure occurred, the PNC Bank

20  accounts were pretty much closed, and he was only operating out

21  of Kentucky Telco, and that $89,000 was seized out of the

22  Kentucky Telco account.

23  Q.  Could you please explain the cash seized in this case, sir?

24  A.  Yeah.  The cash seized, it includes roughly $400,000.  It

25  was seized at the time of the warrants, on July 2nd, from the

1    property at 709 Urton Woods Way, which is related to Joelie

2    Johnson, and which evidence supports that she was living there

3    and renting that property.  So roughly $400,000 of that was

4    seized from that property.

5        And how we know that that's Mr. Watts, how we know that's

6    his money, 'cause he actually -- again, we referenced this

7    earlier, he filed a certified claim that -- taking ownership of

8    that money, saying that money was his, and provided an

9    explanation for it asserting that that money came from

10   substantial revenues that he had received as part of his

11   business as well as rental income that he has received during

12   that time period, and that was explanation for that money.

13   Q.  Okay.  Could you tell the jury about the other expenditures

14   category.

15   A.  The other expenditures category is, essentially, the

16   expenditures that he had that really doesn't fit in any of the

17   other categories.  So in looking at that, it was primarily

18   withdrawals that he had or expenditures that he had directly out

19   of his bank account that were used to pay for -- there was an

20   inordinate amount of local hotel rooms or hotel charges that

21   came out of his account.  There was a large amount of local

22   rental car charges that came out of his account that makes up

23   that number.

24       There also was expenditures for airfare that appears to

25   coincide with trips to Las Vegas.  There is also some shopping,

1    grocery.  I mean, your usual things that you would expect

2    somebody to -- having as part of their just normal monthly

3    personal living expenses.

4    Q.   Could you tell the ladies and gentlemen of the jury about

5    your examination of the tax records regarding 2015 and 2016,

6    please?

7    A.   Sure.  For the 2015 year, Mr. Watts filed a federal tax

8    return and claimed that he earned roughly $60,000 from a

9    cleaning business called National Cleaning Services, and he also

10   claimed that he earned $57,000 in rental income.  For a total

11   of -- as you can see at the top of the chart here, the total

12   income that he reported for the 2015 tax year was 117,000.

13   Q.   Did Mr. Watts report any income from gambling in his tax

14   records?

15   A.   No, he did not.

16   Q.   Agent Stansfield, you have exhibits in front of you.  If you

17   could take a look at those.  They are 101A, B, C, and D.  All

18   101, A through D.  If you could please look at that, sir.

19   A.   Yes.  I recognize these.

20   Q.   Are you familiar with those --

21   A.   Yes.

22   Q.   -- documents?  Are these certified and properly

23   authenticated?

24   A.   Yes, they are.

25   Q.   Okay.  Now, are these just a subset of what's in the bulk

1  records?

2  A.  They are.

3          MS. SULLIVAN:  Okay.  Your Honor, I'd like to move to

4  admit 101A through 101D, please, and publish to the jury.

5          THE COURT:  All right.  Any objection?

6          MR. MASCAGNI:  Subject to the discussion we had

7  outside the presence of the jury.

8          THE COURT:  Okay.  I'm going to ask counsel to

9  approach just real quickly.

10     (Bench conference on the record.)

11         MR. MASCAGNI:  I'm sorry.

12         THE COURT:  That's okay.  I just want to make sure I

13  understand what the objection is.

14         MR. MASCAGNI:  Okay.  As you recall, at the bench, I

15  objected first to hearsay.

16         THE COURT:  Uh-huh.

17         MR. MASCAGNI:  Then to relevancy.

18         THE COURT:  Okay.

19         MR. MASCAGNI:  And you ruled -- overruled me.

20         THE COURT:  Okay.

21         MR. MASCAGNI:  And based on the certification which

22  you saw at a later time, you said, "They are admissible."  I

23  just want to preserve the objection.

24         THE COURT:  Absolutely.

25         MR. MASCAGNI:  That's all.

1          THE COURT:  And I will just respond on the -- then on

2    the hearsay, I think we have -- the records have been certified

3    and authenticated.

4          MR. MASCAGNI:  They have.

5          THE COURT:  I reviewed those certifications.

6    Certainly, on the relevancy, you know, I think they're relevant.

7    I believe the first time the casinos came up, and I think this

8    is some of these documents, at least, are related to the --

9          MS. SULLIVAN:  Yes, Your Honor.

10         THE COURT:  -- casinos.  The first time it came up was

11   actually on your cross-exam of Mr. -- of Agent Sanders.

12         MR. MASCAGNI:  That's correct.

13         THE COURT:  And then I forget what else you had said.

14   I think it was mainly hearsay and authenticating, so --

15         MR. MASCAGNI:  All right.

16         THE COURT:  -- I am going to overrule it, but the

17   record shows that you've --

18         MR. MASCAGNI:  Yes, ma'am.

19         THE COURT:  -- objected and the grounds.

20         MR. MASCAGNI:  Thank you.

21         THE COURT:  Thank you.

22      (End of bench conference.)

23         MS. SULLIVAN:  May I publish, Your Honor?

24         THE COURT:  Yes.  They are admitted, and you may

25   publish them.

1      MS. SULLIVAN:   Thank you.

2      (Government Exhibits 101A, 101B, 101C, and 101D

3  admitted in evidence.)

4  Q.  Agent Stansfield, you testified that you are familiar with

5  this document.  Can you tell the jury what this document is,

6  please, sir?

7  A.  Sure.  This document is a mortgage application that was

8  filed on April 27, 2016, by Dante Watts with a Goldsmith Loans

9  in relation to the property that he purchased at 12600

10  Blackthorn Trace in May of 2016.

11  Q.  Okay.  I'm going to flip on that document.  Can you explain

12  what this page is?

13  A.  Sure.  This is a listing of assets that Mr. Watts is listing

14  on his mortgage application.  He's listing 124,000 in his

15  checking account, roughly 24,000 in his savings account, as well

16  as $100,000 worth of automobiles.

17  Q.  Okay.  If you could describe this page.

18  A.  Yeah.  So this next section here, he's describing -- it

19  asked to tell the loan officer a little more about himself, so

20  he's describing who he is, where he lives.  And then if you look

21  down in the section where it says, "About your employment," this

22  is where he is listing where his income comes from.

23      So on here, he lists that he is the owner of National

24  Cleaning Service and lists his monthly salary from National

25  Cleaning Service at about $3,000, so roughly $36,000 a year, and

1    then he claims that he receives about $44,000 a year in rents

2    from his rental properties.

3    Q.   Okay.  And the rest appears to be the deposit check; is that

4    correct?

5    A.   That's right.

6    Q.   Okay.  So nowhere in this document -- does Mr. Watts claim

7    any gambling income in this document?

8    A.   No, he does not.

9    Q.   And this is a mortgage application?

10   A.   That's right.

11   Q.   101B, could you talk to the jury about that, please?

12   A.   Yeah.  This is a credit application that he filled out with

13   the Venetian, which is also the Las Vegas Sands, Casino in

14   November of 2015.  He's asking for $10,000 in casino credit.

15       And if you -- you'll see the top section there where he's

16   identifying himself as the guest of the Venetian, but then the

17   next section, he describes his employment information, where he

18   also lists that he is the owner of National Cleaning Service.

19   And then below that, he describes having bank accounts at

20   Kentucky Telco and PNC Bank.

21   Q.   Does he report any gambling income on this credit

22   application with the casino?

23   A.   No, he does not.

24   Q.   Thank you, sir.  Government Exhibit 101C, please tell the

25   jury about that.

1    A.   This is a loan application that he provided to Kentucky

2    Telco Credit Union to -- related to the purchase of a 2014

3    GMC -- excuse me.   2014 Dodge truck.   It was submitted in June

4    of 2016.   You'll see where it lists Dante Watts' information as

5    well as his address, and then down where it describes his

6    employment, it also -- he lists himself as the owner of National

7    Cleaners and estimates his income to be $6,600 a month.

8    Q.   Does he report any gambling income on this credit

9    application?

10    A.   No, he does not.

11    Q.   I'm going to show you Government Exhibit 103.   This is the

12    claim he's filed.   Now, his -- you don't know this, Agent

13    Stansfield, but this has been admitted already.   Have you looked

14    through every page of this document?

15    A.   Yes, I have.

16    Q.   Okay.   Does he, anywhere in his claim, state that he has --

17    that these funds, properties purchased, et cetera, the source

18    was income from gambling?

19    A.   No, he does not.

20    Q.   Okay.

21    A.   No.   He mentions that his source of income is from his

22    cleaning service as well as from his rental properties.

23    Q.   Okay.   And, finally, we have Exhibit 101D.   Can you please

24    tell the jury about that?

25    A.   This is a copy of an eviction letter that was mailed to Mr.

1    Watts by the Tropicana Casino on May 11th, 2016.  It refers to a

2    similar type letter that was sent out in April, and they are

3    mentioning in here that they are resending it, possibly to a new

4    address, in May.

5        But it essentially informs Mr. Watts that due to him not

6    being able to verify his income, and the source of the

7    significant gambling activity that he engaged in at their

8    casino, they have no other choice but to evict him from their

9    casino.

10             MS. SULLIVAN:  I have no further questions.

11             MR. MASCAGNI:  May I have one second, Judge?

12             THE COURT:  Yes, you may.

13             MS. SULLIVAN:  Thank you.

14             THE COURT:  Mr. Mascagni, you may cross-examine the

15   witness.

16             MR. MASCAGNI:  Thank you.  I'm sorry, Judge.

17             THE COURT:  No.  Take your time.

18                      CROSS-EXAMINATION

19   BY MR. MASCAGNI:

20   Q.  Is it Agent?  Is that what we go by?

21   A.  I'm technically a supervisory special agent, but --

22   Q.  Supervisory special agent?

23   A.  That's just a whole bunch of mumbo jumbo for really not a

24   whole lot.

25   Q.  All right, sir.  My name is Frank Mascagni.  I'm a defense

1    counsel for Dante Watts, who you've been talking about for the

2    last several minutes.

3    A.   Nice to meet you.

4    Q.   Thank you.  I don't think I've ever been told that.  Nice to

5    meet you, sir.  I just have a couple of questions, because I am

6    not a gambler.  Well, I guess every day is a gamble, but I'm not

7    a professional gambler, and these kind of numbers are staggering

8    to me.

9        Let's go to -- just in general, not on any of this stuff,

10   let's go to --

11            MR. MASCAGNI:  May I get a piece of paper, Judge?

12            THE COURT:  Yes, absolutely.

13   Q.   So I don't run afoul of the timeframes, because I know we

14   split one year, and I understand what we're doing.  So unless I

15   say otherwise, I would like to confine all of my questions,

16   'cause I get excited sometimes, to the timeframes of May 2000 --

17   July 2016 to May 2015.  Fourteen months.

18       So I'm not trying to trick you.  I don't want to go before,

19   don't want to go after, just so -- I know you're smart.  You

20   understand what I'm doing and why.

21       I have read -- I have not read all nine -- 4,000 of your

22   pages, but I have read summaries of folks you interviewed, and I

23   want to make sure that I am not reading your report incorrectly

24   or in a misleading way, but I want to confine it to the 14

25   months, which is going to make my question a little difficult,

```
 1    but we work through it.  I'm sorry.  Having a bad day.
 2            THE COURT:  Take your time.
 3    Q.  I read a memorandum of some of your -- I'm going to do all
 4    this generally.  Some of your investigation as to French Lick
 5    Casino in French Lick, Indiana.  Are you familiar with that?
 6    A.  Yes.
 7    Q.  Okay.  It appears to me, in the timeframes in the brackets,
 8    of 2016, prior to July, there were eight CTRs.  Does that sound
 9    right?  I can approach at any time you want me to.
10    A.  It sounds about right.  He was -- he frequented that casino,
11    based on the records that I reviewed, I believe between December
12    of '15 through just the early part of February of '16.
13    Q.  All right.  Now, so the jury will understand it, since I
14    don't know how many of them gamble or ever have won $10,000,
15    every time -- I guess there's some mechanism within the casino,
16    when you've got $10,000 in chips or you redeem them, they give
17    you a form, and you sign it confirming that to be true, at a
18    minimum of 10,000.  Can be more, but a 10,000 floor?
19    A.  That's right.
20    Q.  Okay.  So when I say they filed eight CTRs, that doesn't
21    mean it's equal to eight -- $80,000.  That means that is the
22    floor line of $80,000, correct?
23    A.  That's correct.
24    Q.  And in this particular case --
25            MS. SULLIVAN:  Frank.
```

1           MR. MASCAGNI:  What do I need to do?  It's coming.

2   Okay.  I probably should have done this bigger.

3   Q.  So there were eight CTRs in the timeframe, and then you, I

4   guess, compared that to the reality of what figure could be

5   greater than eight CTRs, and you came up with 100 -- I'm just

6   going to round it off to 137,000; is that correct?

7   A.  Sounds about right.

8   Q.  Okay.  If I mislead in any way, tell me.

9   A.  When you say 137,000, are you talking about CTRs that

10  reflect money that went in or money that came out?

11  Q.  That's my next question.  That's what I didn't know.

12  A.  Oh, okay.  For French Lick Casino --

13  Q.  Uh-huh.

14  A.  -- it's pretty close to -- they came very close.

15  Q.  Okay.

16  A.  It's roughly 130,000 in, roughly 130,000 out.

17  Q.  All right.  So that's where --

18  A.  For that time period.

19  Q.  That's where I'm going --

20  A.  Uh-huh.

21  Q.  -- since I don't do it.  Let's say, in general, not Mr.

22  Watts, "Frank, you went into a casino.  You bet 4,000," which I

23  wouldn't," and 5,000.  You lost 4,000, 5,000 or you won 10,000

24  or you lost 10,000."  You saw all of his records.  He was a -- I

25  forget your word, was inordinate amount of records.

1    And if I read your stuff correctly, these casinos have the
2    ability to say, "Frank, you bet ten -- you bet ten, you lost
3    ten.  You bet -- you won twenty, you lost forty.  You got some
4    money from the machine.  You won 80.  You lost 70."  And nothing
5    really happens -- well, I guess a lot could happen in there.
6        So you either walk out a loser, which most people do, or you
7    walk out a winner for an extraordinary amount of money; is that
8    correct?  Depending on what your -- what is it called -- risk
9    assessment level is?
10   A.   Yeah.  So my analysis focused on the cash that he walked in
11   with, and that he purchased chips for.
12   Q.   Okay.
13   A.   And then what did he walk out with?
14   Q.   Okay.
15   A.   'Cause that's really more of an accurate reflection of what
16   did he walk in with?
17   Q.   The activity --
18   A.   What did he walk out with?
19   Q.   The activity --
20   A.   Because that's -- that's what this whole --
21   Q.   Between the two?
22   A.   This -- my entire analysis was looking at how much cash did
23   he have access to.
24   Q.   Okay.
25   A.   How much money did he have access to?

1    Q.   All right.  Well, I'm looking at it, at the end of that

2    sentence, how much money did he walk out with?  Okay?

3    A.   Right.

4    Q.   So on some days, he walked out with zero, and some days, he

5    walked out with $200,000; is that correct?

6    A.   Correct.  Sure.

7    Q.   Okay.  That's where I'm going.

8    A.   Sure.

9    Q.   We're on the same page.

10   A.   Sure.

11   Q.   I want them to understand what a CTR is.

12   A.   Sure.

13   Q.   Or how it works.  Okay.  I'm going to go to another

14   investigation that you did.  Or it's called memorandum of

15   interview.

16   A.   It is.

17   Q.   So you know where I'm going.  Now, this was with the

18   Horseshoe Casino in English, Indiana?

19   A.   Yeah.  And so this is referring to a time period in 2014.

20   Q.   All right.  That's where --

21   A.   Only.

22   Q.   -- I'm going.  I was trying to get down to it.  You're

23   correct.  I withdraw the question.  That is outside the

24   parameters.  Thank you for correcting me, quickly correcting me.

25       Do you have any CTRs from Horse Lick Casino in the

```
 1   timeframes we have in front of us?

 2   A.   Horseshoe Casino?

 3   Q.   You styled it Horseshoe Casino in Elizabeth, Indiana.   Yes,

 4   sir.

 5   A.   No.   There are none within the time period --

 6   Q.   Okay.

 7   A.   -- that we are discussing.

 8   Q.   Thank you.   One more.   And that says, in number se --

 9   page -- paragraph 7 of reports, this is between July '15 and

10   April of '16 at the Tropicana Casino in Evansville.   So I think

11   I'm within the timeframes.

12   A.   You are.

13   Q.   Thank you.   If I read what you're saying correctly, during

14   this -- the timeframes available to the jury and the Court, Mr.

15   Watts transacted more than three million dollars in cash buy-ins

16   and more than 1.3 million in losses.   You remember that or you

17   want me to show you a report?

18   A.   When you say losses, do you mean that is how much money he

19   walked out with?   Where there --

20   Q.   No.

21   A.   You're saying there is one point -- you're saying just

22   losses?

23   Q.   Correct.

24   A.   If you're looking at it from just a cash in, cash out --

25   Q.   Yes, sir.
```

1   A.   -- he walked in and spent -- during this entire time period,

2   so we're not just talking about one day, but we're talking

3   between July '15 through April '16.

4   Q.   '16.

5   A.   Tropicana, during that time period, he purchased over three

6   million worth of chips.  So you can see that this big number

7   that we have here in the chart, the 3.5 million, the bulk of

8   that came from Tropicana.

9   Q.   Okay.

10  A.   That's where he spent most of his gambling activity.  And

11  the amount that he walked out with was actually one -- it was

12  1.5 million.  It was 1.5 million.

13  Q.   All right.  Am I mis -- am I misreading this --

14  A.   No.  See, what you're looking at is they looked at just a

15  combination of wins and losses, that the --

16  Q.   Right.

17  A.   -- total amount that he walked out with was 1.5.

18  Q.   Okay.

19  A.   Yeah.

20  Q.   So I know this is --

21  A.   And, again, I'm sorry to cut you off.  I was just going to

22  say, just to explain more to the jury, that's the analysis that

23  I did is I wanted to look at how much cash went in, and how much

24  cash went out.

25  Q.   Okay.  That's what I -- and that's what I'm attempting to

1    do.   You're right with me, if not ten miles ahead of me.   That

2    doesn't mean he walked out with 1.5 million on that day.   That

3    means that is a summary of, I'm going to say, thousands of what

4    I call in-out money on a given professional gambler day, where

5    you may put up 2,000, lose 3,000.

6         That sort of activity for one day, I'm going to guess that's

7    thousands of records from the casino, and, Frank, in -- I'm on

8    July '15.   August, September, October, November, December,

9    January, February, March, April.   In ten months, your client

10   walked out of the -- thousands of transactions, but in that ten

11   months, he had 1.5 million in cash cumulatively over ten months;

12   is that fair?

13   A.   That he walked out with?

14   Q.   Walked out with.

15   A.   Yes.

16   Q.   Walk out, money in my pocket.

17   A.   That he redeemed -- let -- and let's -- just to be clear.

18   So during that time period, he purchased casino chips for about

19   $3 million worth, worth of casino chips.   He then gambles, and

20   most of his gambling, if not all of it, I think there was just a

21   really minimal amount of slot gambling, but the major -- 99

22   percent of the gambling that he did were at tables, and you are

23   primarily gambling with chips --

24   Q.   Right.

25   A.   -- when you're gambling at the tables.   And so, again, my

1    analysis was he purchased chips, three million dollars worth, at

2    the Tropicana over that time period and redeemed chips of

3    roughly 1.5 million.

4    Q.   Okay.

5    A.   So if you're just looking at it from that standpoint, I

6    mean, that's -- he lost around $1.5 million just in dollars.   In

7    what everybody is concerned about, which is money in, money out,

8    he lost 1.5 million.

9    Q.   All right.   On your review of this -- have you done other

10   gamblers before in your back -- in your occupation?

11   A.   I have reviewed other gambling -- casino records --

12   Q.   Right.

13   A.   -- and gambling records.   Yes, I have.

14   Q.   And I think you described this as, I still am losing your

15   word, an extraordinary or inordinate amount of transactions,

16   in-out money?

17   A.   Absolutely, and I'm not the only one that described it that

18   way.   Tropicana did as well.

19   Q.   Okay.

20   A.   I mean, they looked at the amount of gambling activity that

21   he was doing during that time period.   Didn't make sense to

22   them.   They then asked Mr. Watts to verify where this money came

23   from.   He provided them with some information related to his

24   business income and related to his rental income.   They looked

25   at that and then evicted him, because it wasn't adding up.

```
1    Q.  All right.

2    A.  So --

3    Q.  I'm sorry.

4    A.  -- if there was any indication that this money was earned

5    all from gambling, why wouldn't he tell them that?

6    Q.  All right.

7    A.  Why wouldn't he tell them -- why wouldn't he tell Tropicana

8    that that's where this money came from?  And wouldn't they be

9    able to look at their records and see that that's where that

10   came from?  That's --

11            THE COURT:  Yeah.  Are you -- is this a question?  I

12   want to have you --

13            MR. MASCAGNI:  No.  He kind of went off --

14            THE COURT:  Okay.

15            MR. MASCAGNI:  -- on a --

16            THE COURT:  Just listen --

17            MR. MASCAGNI:  -- whim.

18            THE COURT:  -- to the question --

19   A.  I'm sorry.

20            THE COURT:  To the question asked.

21            MR. MASCAGNI:  I didn't know --

22            THE COURT:  Thank you.

23            MR. MASCAGNI:  -- until I looked up at you.

24   Q.  In this same report, some of it is not visible.  It says

25   they confirmed, I want to make sure I keep my dates right, July
```

1    '15 to April of '16, which is within our timeframes of your

2    examination, there were 116 CTRs.  That's what you wrote.

3    A.  That sounds accurate.

4    Q.  Okay.  I'll be happy to show it to you.

5    A.  No.  It sounds accurate.

6    Q.  All right.  If my math is right, you multiply that number

7    times a minimum of $10,000, correct?  So that's -- that's 1.16

8    million, maybe?  If I'm doing math right.

9    A.  Okay.  So you're taking the 116 currency transaction

10   reports, and you're multiplying that by $10,000?

11   Q.  Yeah.  I know it can be more, but --

12   A.  Sure.

13   Q.  -- I'm just trying to get the jury in the ball game here.

14   A.  Sure.

15   Q.  Okay.  And in addition to cash walk-out money, sometimes

16   they write you a check?  The customer, the patron, the gambler

17   can receive his proceeds in cash or part cash, part check; is

18   that fair?

19   A.  Yes.

20   Q.  You saw that --

21   A.  That's correct.

22   Q.  -- during your examination.

23        MR. MASCAGNI:  If I could have one second, Your Honor.

24        THE COURT:  Sure.

25   Q.  Was -- I think you said -- we know the Telco bank account

1    was seized, and I think it was about 89k in it, 89,000, but

2    during this timeframe that we're talking about for 14 months,

3    there was a -- you located, I think, or had mentioned a PNC Bank

4    account.  Was there any money in that account of noticeability?

5    I don't think you addressed that very much.  So it was closed by

6    the time of the end of this period we're talking about?

7    A.   By the time that the Kentucky Telco seizure occurred, which

8    was in July of 2016 --

9    Q.   Okay.

10   A.   -- is when that account seizure happened.

11   Q.   All right.

12   A.   So there wouldn't have been any funds in the PNC account,

13   and that's why there weren't any funds seized from the PNC

14   account.

15   Q.   Okay.  Well, let -- I think I didn't do a good job asking

16   it.  During the 14 months, was there any money -- did you review

17   14 monthly statements through PNC Bank to see if there was any

18   money coming in and out?

19   A.   I did.

20   Q.   Oh, okay.  Was there anything of notability?

21   A.   I mean, there was certainly some money that went in and out

22   of that account.  Where we talked about there was certainly some

23   money from -- a minimal amount of money that appeared to be

24   coming in from his -- from his business.

25   Q.   All right.  So a minimal --

1    A.   Certainly appeared to be a minimal amount of money from --

2    Q.   One thousand --

3    A.   -- his --

4    Q.   -- is that what we're talking about?

5    A.   Yeah, from -- as far as rents being received from the rental

6    income that he was getting from his rental properties.

7    Q.   Okay.

8    A.   There was some cash that was deposited.

9    Q.   Okay.  All right.  So if I say a couple thousand in and out

10   each month, is that in the ball game?

11   A.   That pro -- that sounds about right.

12   Q.   I'm not trying to tie you down.  I just want to get a flow

13   of the money in the account.  Okay.  I'm almost done.  How

14   many -- we've mentioned certain casinos that I think are part of

15   your report, but did you examine any other -- and I don't

16   gamble.  So did you get some records from Belterra?  I'm

17   pointing this way to Indiana.

18   A.   Yes.  We did get records from Belterra.

19   Q.   Right.  You got some from Horseshoe this way going to

20   Indiana, some to -- some -- did you get some from French Lick?

21   A.   Yes.

22   Q.   And some from Tropicana going to Henderson?

23   A.   Right.

24   Q.   And some from Las Vegas.  What did you get from Las Vegas,

25   other than the Venetian, slash, the Sands?  Any other -- did you

1  request any other gambling record from any other casinos in Las

2  Vegas?  I'm taking it that's one, Venetian, slash, Sands.

3  That's one place?

4  A.  That's one place.  That's right.

5  Q.  Did you -- okay.  To help with this, did you look at any

6  others in Las Vegas?

7  A.  During the time period that we are looking at --

8  Q.  Our time period.

9  A.  -- I'm not aware of any.

10 Q.  Yeah.

11 A.  I'm not aware of any.

12 Q.  Okay.  Did you send subpoenas or make phone calls to get

13 documents from all these -- that's a dozen casinos, give or

14 take?

15 A.  Yeah.  A dozen probably would be a little high.

16 Q.  Little high.

17 A.  Maybe eight or nine casinos.  Yeah.

18 Q.  Okay.

19 A.  Eight or nine.  I sent subpoenas to those casinos.  That's

20 right.

21 Q.  All right.  So you presented today only from a limited

22 amount of casinos based on this timeframe that we're talking

23 about, the 14 months?

24 A.  That's right.

25         MR. MASCAGNI:  Okay.  Thank you, sir.  No further

1    questions.

2              THE COURT:  Miss Moore, any cross-examination?

3              MS. MOORE:  No questions, Your Honor.

4              THE COURT:  All right.  Any redirect by the United

5    States?

6              MS. SULLIVAN:  No, Your Honor.

7              THE COURT:  Okay.  Is this witness excused?

8              MS. SULLIVAN:  Yes.

9              THE COURT:  Okay.  You may be excused.  Thank you.

10   A.   Thank you.

11             (End of testimony at 9:51 a.m.)

12

13                  C E R T I F I C A T E

14

15       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

16   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

17

18   s/Rebecca S. Boyd_____              7-23-2020_____
19   Official Court Reporter                    Date

20

21

22

23

24

25

1                           INDEX

2

3    GOVERNMENT WITNESS:                                PAGE

4

5    JOSEPH STANSFIELD

6        Direct Examination by Ms. Sullivan              2
         Cross-Examination by Mr. Mascagni              19
7

8                          EXHIBITS

9

     PLAINTIFF:
10

         Exhibit 99                                      7
11       Exhibit 101A                                   16
         Exhibit 101B                                   16
12       Exhibit 101C                                   16
         Exhibit 101D                                   16
13

14

15

16

17

18

19

20

21

22

23

24

25